UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAN DECHTER, LEON KADIS, MERRY SMITH, TRAUTE MARSHALL, GEORGE FLESH, and REBECCA KATZ<br>　　　　　　　　　　　Plaintiffs<br>　　　　　　v<br><br>CITY OF NEWTON SCHOOL COMMITTEE, RUTH GOLDMAN, in her official capacity as NEWTON SCHOOL COMMITTEE CHAIRPERSON, DAVID FLEISHMAN in his official capacity as NEWTON SUPERINTENDENT OF SCHOOLS, HENRY TURNER in his official capacity as PRINCIPAL OF NEWTON NORTH HIGH SCHOOL, JOEL STEMBRIDGE in his official capacity as PRINCIPAL OF NEWTON SOUTH HIGH SCHOOL, JONATHAN BASSETT in his official capacity as CHAIR OF THE HISTORY AND SOCIAL SCIENCES DEPARTMENT OF NEWTON NORTH HIGH SCHOOL, JENNIFER MORRILL in her official capacity as CHAIR OF THE HISTORY DEPARTMENT OF NEWTON SOUTH HIGH SCHOOL, DAVID BEDAR in his official capacity as HISTORY TEACHER AT NEWTON NORTH HIGH SCHOOL, and JAMIE RINALDI in his official capacity as HISTORY TEACHER AT NEWTON SOUTH HIGH SCHOOL<br>　　　　　　　　　　　Defendants | C. A. NO. 19-10736-DJC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE A REPLY TO PLAINTIFFS' OPPOSITION TO DEFDANDANTS' MOTION TO DISMISS** |

　　　　Plaintiffs hereby oppose Defendants' Motion for leave to file yet another lengthy memorandum in support of their Motion to Dismiss. As ground therefor, Plaintiffs state as follows:

　　　　Defendants requested and Plaintiffs assented to their motion to exceed the page limit for their first memorandum; it was 35 pages long – exceeding the page limit by almost double. In their response to this lengthy memorandum, Plaintiffs' kept their Opposition within the page limit prescribed by the Rules. Now Defendants request that they be allowed to file yet another lengthy memorandum in support of the same motion. Their reasons are patently spurious, and Plaintiffs request that their request be denied. Defendants set forth two arguments in support of their request:

## I. DEFENDANTS' CLAIM THAT PLAINTIFFS' ESTABLISHMENT CLAUSE CLAIM WAS NOT "CLEAR" IS NONSENSICAL

Defendants state that the:

…formulation of [Plaintiffs'] First Amendment claim was not clear from the language of the Amended Complaint, so Defendants did not fully brief this issue in the original Motion to Dismiss. In the [proposed] Reply, Defendants articulate why Plaintiffs have failed to state a claim upon which relief can be granted under the *Lemon* test.

In point of fact, the First Amended Complaint was *quite* clear about the basis of their First Amendment claim, and even included cases on which Plaintiffs base their claim, *including Lemon* v. *Kurtzman*, 403 U.S. 602, (1971), together with a detailed analysis of how the *Lemon* test supports their claim. The First Amended Complaint cites *Lemon* and states, in numbered paragraphs:

56. Noting that "political division along religious lines was one of the principal evils against which the First Amendment was intended to protect," the Supreme Court set out the so-called "Lemon Test" used to scrutinize both state and federal government actions for violation of the Establishment Clause. *See Lemon* v. *Kurtzman*, 403 U.S. 602, 612-13, 622 (1971). All three prongs must be met for a government action to be valid under the Establishment Clause:
    a. The government action must have a secular purpose;
    b. The government action's principal or primary effect must be one that neither advances nor inhibits religion;
    c. The government action must not foster an excessive government entanglement with religion. *See id*.

It then went on to explain exactly how the Lemon test has been applied:

57. Within the public school context, the U.S. Supreme Court has applied the Lemon Test to various religious activities, including the specific activities at issue in how Defendants Moore and Estin teach about the religion of Islam in their ninth grade world history classes at North and South:
    a. Student participation in school prayer.
    b. Use of religious scriptural texts in the classroom.
    c. Teaching religious dogma as fact.

58. In *Lee v. Weisman*, 505 U.S. 577 (1992), the U.S. Supreme Court struck down a Providence, R.I. School Committee policy that allowed religious invocations by members of the clergy at middle and high school graduation ceremonies, for violating the second prong of the Lemon Test "to the point of creating a state-sponsored and state-directed religious exercise in a public school. *Id.* at 587.

59. The Court insisted that prayer exercises in public schools, however voluntary or however inclusive they may be, are highly likely to result in division and coercion:
"The potential for divisiveness is of particular relevance [when] it centers [on] an overt religious exercise in a secondary school environment where . . . subtle coercive pressures exist and where the student had no real alternative which would have allowed her to avoid the fact or appearance of participation." *Lee v. Weisman*, 505 U.S. 577, 588 (1992).

60. Students did not actually have to pray along with the invocation, and were not directly coerced into participating in the ceremony through, for example, the threat of receiving a poor grade. Nevertheless, the Court noted at length the particular vulnerabilities of high school students, due to their age and the school environment, of indirect coercion. This coercion can be every bit as real as getting an F for refusing to pray as part of a classroom assignment. According to the Court:
prayer exercises in public schools carry a particular risk of indirect coercion. The concern may not be limited to the context of schools, but it is most pronounced there. What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy.

We need not look beyond the circumstances of this case to see the phenomenon at work. The undeniable fact is that the school district's supervision and control of a high school graduation ceremony places public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the invocation and benediction. This pressure, though subtle and indirect, can be as real as any overt compulsion. Of course, in our culture standing or remaining silent can signify adherence to a view or simple respect for the views of others. And no doubt some persons who have no desire to join a prayer have little objection to standing as a sign of respect for those who do. But for the dissenter of high school age, who has a reasonable perception that she is being forced by the State to pray in a manner her conscience will not allow, the injury is no less real.

. . .

Finding no violation under these circumstances would place objectors in the dilemma of participating, with all that implies, or protesting. We do not address whether that choice is acceptable if the affected citizens are mature adults, but we think the State may not, consistent with the Establishment Clause, place primary and secondary school children in this position. Research in psychology supports the common assumption that adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention. To recognize that the choice imposed by the State constitutes an unacceptable constraint only acknowledges that the government

may no more use social pressure to enforce orthodoxy than it may use more direct means. *Lee v. Weisman*, 505 U.S. 577, 592-594 (1992).

61. In *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963), the U.S. Supreme Court struck down voluntary public school readings from the Christian Bible and the voluntary recitation of Christianity's "Lord's Prayer." "Surely the place of the Bible as an instrument of religion cannot be gainsaid," the Court noted in its opinion. *Id.* at 224. It also noted the testimony of an expert witness, "that portions of the New Testament were offensive to Jewish tradition and that, from the standpoint of Jewish faith, the concept of Jesus Christ as the Son of God was 'practically blasphemous.'" *Id.* at 209. The expert witness also "cited instances in the New Testament which, assertedly, were not only sectarian in nature but tended to bring the Jews into ridicule or scorn." *Id.*

62. In *Stone v. Graham*, 449 U.S. 39, 39 (1980), the U.S. Supreme Court struck down, under the first prong of the Lemon Test, a Kentucky statutory requirement that copies of the Ten Commandments, derived from the Old Testament, be posted in the state's public school classrooms. The Kentucky legislature had explained the secular purpose of the statute: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 41. Nevertheless, the Court found that:
The pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact. The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day. *Id.* at 41-42 (citations omitted).

63. Neither did the Court find it "significant that the Bible verses involved in this case are merely posted on the wall, rather than read aloud as in *Schempp*. . ." *Id.* at 42. According to the Court:
If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause. *Id.*

64. In two cases striking down state requirements that either the scientific theory of human evolution shall not be taught, or that it may only be taught on par with the religious belief in creation by a supernatural being, the U.S. Supreme Court held and then reiterated that "the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." *Edwards v. Aguillard*, 482 U.S. 578, 591 (1987); *Epperson v. Arkansas*, 393 U.S. 97, 106 (1968).

65. In ruling that an Arkansas criminal statute making it a misdemeanor for public school teachers to teach the theory of human evolution, the Court stated that "the First Amendment 'does not tolerate laws that cast a pall of orthodoxy over the classroom.'"

4

*Epperson v. Arkansas*, 393 U.S. 97, 105 (1968) (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)).

66. Specifically, public schools may not use the Bible as a source of, or confirmation for, religious dogma in preference to objective science:
While study of religions and of the Bible from a literary and historic viewpoint, presented objectively as part of a secular program of education, need not collide with the First Amendment's prohibition, the State may not adopt programs or practices in its public schools or colleges which "aid or oppose" any religion. This prohibition is absolute. It forbids alike the preference of a religious doctrine or the prohibition of theory which is deemed antagonistic to a particular dogma. *Epperson v. Arkansas*, 393 U.S. 97, 106-107 (1968) (citations omitted).

67. The constitutional infirmity of the Arkansas "monkey law," as the Court termed it, was, to the Court, unmistakable:
The overriding fact is that Arkansas' law selects from the body of knowledge a particular segment which it proscribes for the sole reason that it is deemed to conflict with a particular religious doctrine; that is, with a particular interpretation of the Book of Genesis by a particular religious group. The antecedents of today's decision are many and unmistakable. They are rooted in the foundation soil of our Nation. They are fundamental to freedom. Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice. It may not be hostile to any religion or to the advocacy of no-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. *Id.* at 103-104.

68. The U.S. Supreme Court affirmed the Epperson ruling in striking down a Louisiana statute that required the teaching of "creation science" to accompany any teaching of the theory of evolution in Louisiana public schools, reiterating that "there can be no legitimate state interest in protecting particular religions from scientific views distasteful to them. . ." *Edwards v. Aguillard*, 482 U.S. 578, 590-591 (1987) (internal quotation marks omitted).

69. The Court struck down the Louisiana statute under the first prong of the Lemon Test, rejecting the statute's ostensible secular purpose to protect academic freedom:
The legislative history documents that the Act's primary purpose was to change the science curriculum of public schools in order to provide persuasive advantage to a particular religious doctrine that rejects the factual basis of evolution in its entirety. . . . In this case, the purpose of the Creationism Act was to restructure the science curriculum to conform with a particular religious viewpoint. Out of many possible science subjects taught in the public schools, the legislature chose to affect the teaching of the one scientific theory that historically has been opposed by certain religious sects. . . . Because the primary purpose of the Creationism Act is to advance a particular religious belief, the Act endorses religion in violation of the First Amendment. Edwards v. Aguillard, 482 U.S. 578, 592-93 (1987)

70. The third prong of the Lemon Test was used by the U.S. Supreme Court in Lemon v. Kurtzman itself to invalidate state education subsidies to religious groups. The Lemon analysis of entanglement looks at the form of the government's relationship with a religious entity in light of all the circumstances, including:
    a. The character and purpose of the religious institutions benefited.

    b. The nature of the aid provided to the religious institutions.
    c. The resulting relationship between the government and the religious authority. *See Lemon* v. *Kurtzman*, 403 U.S. 602, 615 (1971).

71. At several times in the U.S. Supreme Court's Religion Clauses jurisprudence, the Court has been forced to respond to charges that it is hostile to a particular religion – or to all religions in general. In *County of Allegheny v. ACLU*, 492 U.S. 573, 610 (1989), while ruling the government display of a nativity scene unconstitutional, the Court complained that Justice Kennedy, writing in dissent, "misperceived a respect for religious pluralism, a respect commanded by the Constitution, as hostility or indifference to religion. No misperception could be more antithetical to the values embodied in the Establishment Clause. . . . [N]othing could be further from the truth, and the accusations could be said to be as offensive as they are absurd." *Id.*

72. In the school prayer case *Engel* v. *Vitale*, 370 U.S. 421, 433-434 (1962), the Court complained that: "It has been argued that to apply the Constitution in such a way as to prohibit state laws respecting an establishment of religious services in public schools is to indicate a hostility toward religion or toward prayer. Nothing, of course, could be more wrong. . . . It is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance." *Engel* v. *Vitale*, 370 U.S. 421, 433-435 (1962)

Thus, the assertion that the "formulation of [Plaintiffs'] First Amendment claim was not clear from the language of the Amended Complaint does not pass the straight face test.

Moreover, Defendants already specifically addressed this very issue in their memorandum. Starting on page 28 of their memorandum, they have a section specifically arguing that Plaintiffs have "failed to establish a valid Establishment Clause claim" and even cite *Lemon v Kurtzman*.

## II. DEFENDANTS' CLAIM THAT THEY NEED TO ADDRESS MUNICIPAL TAXPAYER STANDING IS DISINGENUOUS

Defendants wish to "addresses Plaintiffs' position that they can wait until the discovery stage of the case to articulate the facts needed to properly allege the elements of municipal taxpayer

6

standing" and that Plaintiffs "misunderstand the nature of standing as well as the specific elements Plaintiffs must allege to properly proceed under the municipal taxpayer standing doctrine". However, Defendants have already extensively addressed taxpayer standing in their lengthy memorandum not once, but twice. They provide absolutely no reason why they need to file yet another memorandum to address this same point. The heading of section II in Defendants' memorandum, at p. 4, is: "Plaintiffs' Mandamus Claims Should be Dismissed Because They Lack Standing….". The heading of section III in their memorandum, at p. 22, is: 'Plaintiffs' First Amendment Claim Should be Dismissed Because…Plaintiffs Lack Standing….".

WHEREFORE, for all of the above reasons, Plaintiffs respectfully request that Defendants' Motion to file yet an additional memorandum on the same points they have already briefed, be denied. If the Court decides to grant the motion, Plaintiffs seek leave to file a reply and also request a postponement of the motion to dismiss hearing for a reasonable period in order to allow Plaintiffs time to review Defendants' additional arguments, draft their reply, and prepare for the hearing.

REQUEST FOR ORAL ARGUMENT

        Plaintiffs
        By their attorney,

        */s/ Karen Hurvitz*

        Karen D. Hurvitz, BBO#245720
        Law Offices of Karen D. Hurvitz
        34 Tanglewood Drive
        Concord MA 01742
        HurvitzLaw@comcast.net
        (617) 513-3365

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on July 5th 2019.

*Karen Hurwitz*