ALAN DECHTER, LEON KADIS, MERRY SMITH, TRAUTE
    MARSHALL, GEORGE FLESH, and REBECCA KATZ, and
    JOHN DOE

                    Plaintiffs

        v

CITY OF NEWTON SCHOOL COMMITTEE, RUTH
    GOLDMAN, in her official capacity as NEWTON SCHOOL
    COMMITTEE CHAIRPERSON, DAVID FLEISHMAN in his
    official capacity as NEWTON SUPERINTENDENT OF
    SCHOOLS, HENRY TURNER in his official capacity as
    PRINCIPAL OF NEWTON NORTH HIGH SCHOOL, JOEL
    STEMBRIDGE in his official capacity as PRINCIPAL OF
    NEWTON SOUTH HIGH SCHOOL, JONATHAN
    BASSETT in his official capacity as CHAIR OF THE
    HISTORY AND SOCIAL SCIENCES DEPARTMENT OF
    NEWTON NORTH HIGH SCHOOL, JENNIFER MORRILL
    in her official capacity as CHAIR OF THE HISTORY
    DEPARTMENT OF NEWTON SOUTH HIGH SCHOOL,
    DAVID BEDAR in his official capacity as HISTORY
    TEACHER AT NEWTON NORTH HIGH SCHOOL, and
    JAMIE RINALDI in his official capacity as HISTORY
    TEACHER AT NEWTON SOUTH HIGH SCHOOL

                    Defendants

C. A. NO. 19-10736-DJC

**PLAINTIFFS'
MEMORANDUM OF LAW
IN SUPPORT OF MOTION
TO PROCEED UNDER
PSEUDONYM AND FOR
LEAVE TO FILE
AFFIDAVIT UNDER SEAL**

Plaintiff John Doe is a parent of child(ren) in the Newton Public Schools (NPS). He/she joins this lawsuit challenging the mandatory ninth grade world history classes taken by all students at both NPS high schools, in which they are taught Islamic dogma as fact and required to perform Islamic rituals and Quranic exegesis for a grade, in violation of the Establishment and Free Exercise Clauses of the U.S. Constitution. The lawsuit also challenges NPS teachers' refusal to review their curricula for simplistic and demeaning generalizations based on the Jewish religion and Israeli national origin in violation of Massachusetts civil rights laws.

Suits, such as the instant one, where the establishment and free exercise of religion is at issue, require plaintiffs to disclose information about their religious beliefs that is of the utmost intimacy. Suits challenging governmental conduct under the Establishment Clause or civil rights laws tend to arouse strong emotions in the affected community, and thus far, this case has proven no exception. Establishment Clause or civil rights plaintiffs and their families often suffer social ostracism, economic injury, governmental retaliation, and even physical violence. Plaintiff Doe here fears that he/she, too, will suffer harassment and retaliation — fears to which his/her own past and recent experiences in the Newton community have contributed.

Defendants have a track record of publicly naming the parents and students who challenge their curriculum decisions from the very beginning of the controversy that undergirds this case. As the Massachusetts Department of Elementary and Secondary Education ruled in 2014, Defendant Newton School Committee either negligently or intentionally violated the Department's student regulations by releasing to the media personally identifiable information about an NPS student whose parent challenged the antisemitic and anti-Israel portions of Defendants' curriculum. Such illegal public exposure of dissenting parents and students has, throughout the controversy, been accompanied by public intimidation, vitriol, and ostracism directed at Defendants' critics by Defendants and their supporters. As a result of the hostile environment created and encouraged by Defendants within the Newton Public School community, among the residents of the City of Newton, throughout the Commonwealth via the union organizing activities of the Massachusetts and Newton Teachers Associations, and in various internet fora, Plaintiff Doe fears that social stigmatization, real danger of physical harm, economic retaliation, and the very injury he is litigating against will occur if his or his child(ren)'s identity is disclosed. Plaintiff Doe's interests in his/her own and his/her family's

safety, well-being, and privacy far outweigh the public's interest in knowing their identities and any potential for prejudice to Defendants.

## **ARGUMENT**

### I.   **Relevant Legal Standard for Allowing Plaintiffs to Proceed Pseudonymously in the District of Massachusetts**

The Federal Rules of Civil Procedure require a case caption setting forth a title containing "the names of all the parties." Fed. R. Civ. P. 10(a). As a general matter, therefore, cases filed in or removed to federal courts are a matter of public record, which serves the public's important interest in open judicial proceedings. *See Doe v. Smith*, No. 18-12266-PBS, 2018 U.S. Dist. LEXIS 188585, at *1-2 (D. Mass. Nov. 5, 2018) (allowing adult El Salvadorian undocumented person to file pseudonymous habeas action against named government official). "Nevertheless, permitting a party to proceed anonymously may be warranted in exceptional circumstances. . ." *Patrick Collins, Inc. v. Does* 1-38, 941 F. Supp. 2d 153, 161 (D. Mass. 2013) (quotation marks omitted).

Although several circuits have developed detailed case law for pseudonymous litigation, neither the Supreme Court nor the First Circuit has set forth a test to determine those 'exceptional circumstances' when a plaintiff may overcome the presumption of openness in judicial proceedings and proceed under pseudonym. In the District of Massachusetts, plaintiffs have been allowed "to proceed anonymously in cases involving social stigmatization, real danger of physical harm, or where the injury litigated against would occur as a result of the disclosure of plaintiff's identity;" as well as cases where "plaintiffs [were] challenging governmental activity [or were] required to disclose information of the utmost intimacy. . ." *Doe v. Bell Atl. Business Sys. Servs.*, 162 F.R.D. 418, 420 (D. Mass. 1995) *See also Doe v. Brandeis Univ.*, No. 19-11049-

LTS, 2019 U.S. Dist. LEXIS 82550, at *2 (D. Mass. May 15, 2019) (allowing plaintiff to proceed pseudonymously due to risk of social stigmatization); *Doe v. Smith*, No. 18-12266-PBS, 2018 U.S. Dist. LEXIS 188585, at *3 (D. Mass. Nov. 5, 2018) (allowing plaintiff to proceed pseudonymously due to risk of physical harm); *Doe v. Aetna Life Ins. Co.*, No. 14-14716-PBS, 2016 U.S. Dist. LEXIS 194383, at *10 (D. Mass. Apr. 18, 2016) (allowing plaintiff to proceed pseudonymously due to risk to physical and mental health). When the plaintiff's "need for confidentiality," on balance, outweighs "the public interest in disclosure," the plaintiff may proceed pseudonymously. *Doe v. Bell Atl.*, 162 F.R.D. at 420. An important element in this balancing consideration is the extent to which the identity of a plaintiff seeking to proceed pseudonymously has already been disclosed;  the District of Massachusetts has "held that previous disclosure of a party's identity made the motion to proceed anonymously ineffective." *Doe v. Word of Life Fellowship, Inc.*, No. 11-40077-TSH, 2011 U.S. Dist. LEXIS 78383, at *7 (D. Mass. July 18, 2011) (citing *Doe v. Bell Atl.*, 162 F.R.D. at 422.).

In addition to the above factors, other Circuits have routinely looked at "the ages of the persons whose privacy interests are sought to be protected," *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993), and have allowed the use of pseudonyms "when necessary to protect the privacy of children." *Doe v. Blue Cross & Blue Shield United*, 112 F.3d 869, 872 (7th Cir. 1997). *See also* ACLU-VA's Memorandum in Support of Plaintiffs' Motion for Leave to Proceed Using Pseudonyms and for Protective Order at 2, 10, *Does v. School Bd. of Giles Cty.*, No. 7:11-cv-00435 (W.D. Va. 2012).

Massachusetts state courts, where this case was originally filed, have regularly granted school-age children pseudonymous status, and the Massachusetts Supreme Judicial Court ("SJC") has routinely allowed the use of pseudonyms unchallenged. See, e.g., *Doe v. Acton-*

*Boxborough Regional Sch. Dist.*, 468 Mass. 64, 66 (2014); *Doe v. Superintendent of Sch., 421 Mass*. 117, 118 (1995); *Nicholas B. v. School Comm. of Worcester*, 412 Mass. 20, 21 (1992). In *Doe v. Acton-Boxborough*, 468 Mass. at 66, the SJC allowed parent/child plaintiffs to bring a pseudonymous lawsuit against the optional recitation of the United States Pledge of Allegiance under Mass. Const. amends. art. 106 and M.G.L. c. 76, § 5—the same state law bases that are now used by Plaintiff Doe to challenge Defendants' mandatory curriculum. The *Doe v. Acton-Boxborough* plaintiffs were allowed to proceed pseudonymously despite there being "no evidence in the summary judgment record that the Doe children have ever been subjected to any type of punishment, bullying or other mistreatment, criticism, condemnation, or ostracism as a result of not participating in the pledge or not reciting the words 'under God.'" *Id.* at 69.  In their opposition, Defendants cite to an order, attached to their opposition as an exhibit,  in a Massachusetts state case where a motion to proceed pseudonymously was not allowed and claim that the cases are "identical".  They are not: that case is a contract action filed by adult plaintiff students against their university over a single event. Here, a plaintiff parent of minor child(ren) is seeking to proceed in an Establishment Clause action against his/her city's public school system over a controversy lasting eight years, in which a long record of social ostracism of critics by administrators, teachers, and students exists.

There is an alarming history of violence and threats of violence against Establishment Clause plaintiffs across the country, and the U.S. Supreme Court, along with many Circuits, have permitted both adult and minor plaintiffs to proceed pseudonymously in Establishment Clause cases. *See, e.g.*, *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 294 (2000) (noting that district court permitted students and parents challenging student-led prayer at public-school football games to litigate anonymously); *Doe v. Porter*, 370 F.3d 558, 561 (6th Cir. 2004) (upholding

protective order allowing parents to proceed pseudonymously in challenge to public schools'

practice of teaching Bible as religious truth); *Doe v. County of Montgomery*, 41 F.3d 1156, 1158,

1162 (7th Cir. 1994) (holding that anonymous plaintiffs had standing to challenge display of

permanent metal sign reading, "THE WORLD NEEDS GOD," over main entrance to county

courthouse); *Doe v. Vill. of Crestwood*, 917 F.2d 1476, 1477 (7th Cir. 1990) (adjudicating

challenge by pseudonymous plaintiff to constitutionality of municipal festival at which Roman

Catholic mass was held); *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981) (holding that

plaintiffs challenging constitutionality of prayer and Bible-reading exercises in schools were

entitled to proceed under pseudonyms); *Yacovelli v. Moeser*, No. 1:02CV596, 2004 WL

1144183, at *9 (M.D.N.C. May 20, 2004) (holding that "Plaintiffs' personal religious beliefs at

stake combined with Defendants' weak showing of prejudice lean in favor of allowing

pseudonyms" in Establishment Clause challenge to public university's requirement that students

read Qu'ran); *Doe v. Harlan County Sch. Dist.*, 96 F. Supp. 2d 667, 670-71 (E.D. Ky. 2000)

(permitting plaintiffs challenging Ten Commandments display to proceed pseudonymously).

## II. <u>Disclosing Plaintiff Doe's Identity Will Result in Social Stigmatization, Real Danger of Physical Harm, and the Very Injury He/She Is Litigating Against</u>
### A. <u>Establishment Clause Plaintiffs Routinely Face Social Stigmatization, Harassment, and Other Forms of Retaliation, Including Physical Violence</u>

The Plaintiffs in this case face a unique risk inherent in Establishment Clause cases due

to the long history of violence and threats of violence that attends such cases. For example, after

Vashti McCollum brought a suit in 1945 objecting to the practice of allowing public school

students to attend religious classes held in public school classrooms, *see Illinois ex rel.*

*McCollum v. Bd. Of Educ.*, 333 U.S. 203 (1948), her house was vandalized, she received

hundreds of pieces of hate mail, and her sons were physically attacked. *See* ROBERT S. ALLEY,

WITHOUT A PRAYER: RELIGIOUS EXPRESSION IN PUBLIC SCHOOLS 84-89 (1996)).

In 1981, Joann Bell and Lucille McCord filed suit to block religious meetings and the distribution of Gideon Bibles in their children's schools. *See Bell v. Little Axe Indep. Sch. Dist. No. 70,* 766 F.2d 1391 (10th Cir. 1985). The plaintiffs' children were consequently branded as "devil worshipers." ALLEY, *supra*, at 106. "An upside-down cross was hung on thirteen-year-old Robert McCord's locker," *Id.,* and the Bells received threatening telephone calls. "More than once a caller said he…was going to break in the house, tie up the children, rape their mother in front of them, and then 'bring her to Jesus.'" *Id.* at 107-08. The threats were far from empty: the Bells' home was burned down. *Id.*

In 1994, Lisa Herdahl brought an action challenging prayer practices in her children's schools. *See Herdahl v. Pontotoc County Sch. Dist.*, 887 F. Supp. 902 (N.D. Miss. 1995). As a result, her children were called "atheists and devil worshipers" by their classmates. Stephanie Saul, *A Lonely Battle in Bible Belt: A Mother Fights to Halt Prayer a Miss. School*, NEWSDAY, Mar. 13, 1995, at A8. Other children were threatened with beatings by their parents if they were caught talking to, or playing with, the Herdahl children. ALLEY, *supra*, at 177. There were reports that a boycott would be organized against the convenience store where Lisa Herdahl worked. Saul, *supra*, at A08. Herdahl gave up her job "because of threats against her children." ALLEY, *supra*, at 182. And she received death threats and threats that her home would be firebombed. *Id.* at 186.

Similarly, the children of one of the plaintiffs in *School District v. Schempp*, 374 U.S. 203 (1963) (in which Bible reading in the public schools was held unconstitutional), were beaten on their way home from school, and their house firebombed. Alley, *supra*, at 98. The son of the plaintiff in *Chandler v. Siegelman*, 230 F.3d 1313 (11th Cir. 2000) (a challenge to prayer at school-related events), was "harassed at school almost daily." Jonathan Ringel, *Alabama Claims*

*U.S. Court Order Denies Students' Right to Pray,* FULTON COUNTY DAILY REP., Dec. 4, 1998, at 1. And even though she was not a plaintiff but merely a vocal opponent of the school-prayer policy challenged in *Sante Fe Independent Schol District v. Doe,* 530 U.S. 290 (2000), Debbie Mason received threatening phone calls and was followed home by persons trying to scare her. Kenny Byrd, *Baptist Family Opposed to Football Prayer Feels Pressure*, BAPTIST STANDARD, June 12, 2000. Eventually, her husband and children became unable to find work in the town where they lived. *Id.*

Tammy Kitzmiller, the lead plaintiff in a high-profile case challenging a Pennsylvania school district's promotion of intelligent design, received death threats, among other hate mail. *Judgment Day: Intelligent Design on Trial* (PBS *NOVA* television broadcast Nov. 13, 2007); *see generally Kitzmiller v. Dover Area School District,* 400 F. Supp. 2d 707, 721-22 (M.D. Pa. 2005). New Jersey high-school student Matthew LaClair also received a death threat after he tape-recorded and publicly objected to his history teacher's frequent proselytizing of students. Tina Kelley, *Talk in Class Turns to God, Setting Off Public Debate on Rights,* N.Y. TIMES, Dec. 18, 2006, at B1. After speaking out, LaClair was quickly ostracized by his classmates. Matthew LaClair, *Scholarship Essay,* http://www.aclu.org/students/34399res20080314.html.

In the case of *Wynne v. Town of Great Falls*, 376 F.3d 929 (4th Cir. 2004), the plaintiff suffered extreme harassment at the hands of her neighbors after she sued to enjoin a town council from opening its meetings with sectarian prayers. Individuals unhappy with the suit broke into the plaintiff's home and beheaded her pet parrot, leaving behind a note reading, "You're next!" *See* Christina Lee Knauss, *A Quiet Life No More,* THE STATE, Sept. 19, 2004, at D1. In addition, several of the plaintiff's pet cats were killed and her pet dog was beaten. *Id.* Tyler Deveny, the eighteen-year-old plaintiff in *Deveney1 v. Board of Education*, 231 F. Supp. 2d 483 (S.D.W. VA.

2002), endured a beating of his own after successfully challenging the invocation planned for his high-school graduation ceremony. *See* Charles Shumaker, *Student Beaten for Prayer Suit, He Says,* CHARLESTON GAZETTE & DAILY MAIL, June 19, 2002, at 6D. A group of eight teens evidently displeased with the outcome attacked Deveny in a public place, with one saying, "Oh, you hate God," before striking Deveny in the face. *Id.* Unlike Deveny, the Dobrich family— plaintiffs in *Dobrich v. Walls*, 380 F. Supp. 2d 366 (D. Del. 2005)—did not suffer physical violence after challenging their public school district's practices of permitting teaches to proselytize and distribute Bibles to non-Christian students and of rewarding students who attended school-sponsored Bible clubs. *See* David Bario, *A Lesson in Tolerance*, AM. LAWYER, July 2008, at 122. But the harassment, anti-Semitic taunts, and veiled threats the family endured from fellow community members ultimately drove them to move to another county. *Id.*

## B.  Plaintiff Doe Fears from Other Parents' Experience That, If Defendants Learn His/Her Identity, They Will Disclose It to the Public

At the very beginning of the controversy undergirding this case, a parent of a student enrolled at NPS complained about the curriculum. Shortly thereafter, Defendant Newton School Committee leaked both the parent and the student's names to the media. On April 23, 2014, DESE formally determined that Defendant "Newton School Committee has violated the Department's student record regulations by producing to the media . . . a letter containing personally identifiable information about a student. . . related to allegations involving a specific student . . . and the appropriateness of the curriculum taught by Newton teachers to the student and the student's *See* letter from Massachusetts Department of Elementary and Secondary Education, attached to the Affidavit of Karen Hurvitz, submitted herewith."

While the Establishment Clause plaintiffs described in the cases above were accused of being anti-Christian, the parent whose name was leaked to the media by Defendant Newton School Committee was accused of being anti-Muslim, which has been a frequent accusation lobbed by Defendants and their supporters at those who challenge the NPS Islam curriculum. *See* Evan Jacobi, *Newton School Retaliates Against Students and Staff Who Report Anti-Semitism*, THE ALGEMEINER (Jan. 15, 2018), https://www.algemeiner.com/2018/01/15/newton-school-retaliates-against-students-and-staff-who-report-antisemitism/.

Through his/her community, Plaintiff Doe is aware of the enormous mental pain and anguish, threats of physical harm, and social ostracism endured by the parent and student whose names were leaked to the media by Defendant Newton School Committee after the parent raised concerns about anti-Jewish and anti-Israel curricular materials. According to a disparaging email about the parent sent by Defendant Bassett to Defendant Turner, the parent now "has some mental health issues and is visibly unwell." See email attached to the Affidavit of Karen Hurvitz, submitted herewith.  Plaintiff Doe fears that, if his/her identity, or the identity of his/her children becomes known to Defendants, it will, given Defendants' past practice, become known to the general public as well, resulting in the same social ostracism and harm to physical and mental health faced by the parent and student whose names were leaked to the media by Defendant Newton School Committee. *See, e.g, Doe v. Brandeis Univ.*, No. 19-11049-LTS, 2019 U.S. Dist. LEXIS 82550, at *2 (D. Mass. May 15, 2019) (allowing plaintiff to proceed pseudonymously due to risk of social stigmatization); *Doe v. Smith*, No. 18-12266-PBS, 2018 U.S. Dist. LEXIS 188585, at *3 (D. Mass. Nov. 5, 2018) (allowing plaintiff to proceed pseudonymously due to risk of physical harm); *Doe v. Aetna Life Ins. Co.*, No. 14-14716-PBS, 2016 U.S. Dist. LEXIS

194383, at *10 (D. Mass. Apr. 18, 2016) (allowing plaintiff to proceed pseudonymously due to risk to physical and mental health).

### C.  Plaintiff Doe Fears His/Her Child(ren) Will Be Harmed by Teachers' Social Ostracism if His/Her Identity Becomes Known to Defendants

Amici Massachusetts Teachers Association (MTA) and Newton Teachers Association (NTA) have interpreted community concerns over the NPS curriculum as attacks on teachers, and have incited their teacher members with "us-versus-them" rhetoric and violent metaphors. On October 11, 2018, the Newton Teachers Association organized a "teacher standout" on the grounds of Newton North High School, where teachers and students chanted, "Newton teachers under attack! What do we do? Stand up, fight back!" Newton North teacher John Fitzgerald claimed at the rally that "our colleagues are under attack by folks willing to engage in all sorts of unprincipled behavior in order to move their hateful agenda." Defendant Fleishman attended the teacher rally in support. The "teacher standout" can be seen here:

https://www.facebook.com/watch/?v=252506282123340

This incitement of teachers against community members who question the Newton curriculum is even more aggressive online. MTA has written that, "[w]hen a right-wing fringe group attacked teachers in Newton for daring to teach multiple perspectives on the Arab-Israeli conflict, it was as if the Enlightenment itself was on trial."

https://massteacher.org/news/2018/11/critical-thinking-beats-censorship-in-newton

The NTA claims online that "[t]his episode is not about Israel, or Islam, or any teacher or school district. It's about a small, yet vocal and well-funded groups [sic] trying to intimidate

teachers, undermine public education, and advance their own agendas while suppressing critical thinking." http://www.newteach.org/in-defense-of-critical-thinking-2/

The administrator Defendants have done nothing to rein in the teachers under their supervision. According to the Anti-Defamation League and the Jewish Community Relations Council of Boston, despite the organizations' identifying to the administrator Defendants instructional and educational materials "which we consider anti-Semitic," the administrator Defendants "have not been consistently forthcoming when asked to address legitimate concerns on specific topics over the years." https://www.adl.org/news/op-ed/setting-the-record-straight-jewish-communal-response-to-middle-east-curriculum-in-newton

Plaintiff Doe is concerned that many Newton teachers and other members of NTA will strongly favor their colleague Defendants in this case. Plaintiff Doe is worried that the social ostracism and opprobrium that Newton teachers and their union have so far heaped on those challenging the Newton curriculum will be heaped upon Plaintiff Doe and his/her child(ren) as well; and that, as a result, Plaintiff Doe's child(ren) may be judged, graded, and afforded or denied opportunities based on his/her decision to take part in this suit. Because discrimination can be very subtle, Plaintiff Doe believes that it would be virtually impossible to determine whether any school official who made an adverse decision with respect to his/her child(ren) had been influenced by his or her knowledge of Plaintiff Doe's involvement in this lawsuit if his/her identity becomes known to Defendants. Plaintiff Doe is concerned that his/her children will be treated with hostility when reporting any discrimination that they may encounter.

### D.  Plaintiff Doe Fears His/Her Child(ren) Will Be Subject to Social Ostracism and Threats of Physical Harm from Students if His/Her Identity Becomes Known to the Public

Despite—or because of—the fact that the City of Newton and its schools host a very significant Jewish minority, Newton's schools have a very significant problem with anti-Semitic and anti-Israel bullying of students by their peers. As Defendants Fleishman and Goldman themselves grudgingly acknowledged on November 15, 2018, "over the past several years, the Newton Public School (NPS) system has received criticism for occasionally being an unsafe space for Israeli and pro-Israel students." https://www.israeliamerican.org/boston/media/letter-to-community-iac-boston-and-newton-public-schools.

This admission followed the August 2018 claims by a Newton North parent on national television that his child was:

> ". . .branded on the internet by dozens of other fellow students with antisemitic and other hateful remarks. In my case, my son is Jewish and he was branded a Nazi, photoshopped onto his hat. It went all over the internet, there was multiple comments made by other student body supporting this and encouraging it; and, essentially, we had strong meetings and conversations with the schools in Newton. They refused to do anything, in my opinion, to correct this situation."

> *Fox and Friends* (Fox News television broadcast Aug. 13, 2018),

> https://www.youtube.com/watch?v=fvsD87-TBQE

In 2016, there were at least three instances of antisemitic graffiti, including swastikas, at Newton North, "fueling allegations of prejudice and anti-Semitism at the school," according to THE BOSTON GLOBE. *See* Ellen Ishkanian, *Anti-Semitic graffiti found at Newton North High School*, THE BOSTON GLOBE (Mar. 16, 2016), https://www.bostonglobe.com/metro/2016/03/16/anti-semitic-graffiti-found-newton-north-high-school/GfRJbZywwRHAHMDvmu6J3H/story.html.

The year before, three incidents of antisemitic graffiti were found at Newton's F.A. Day Middle School, including a threat of physical violence—"Burn the Jews"—written in a boys'

bathroom and a swastika in the snow outside the school. The principal of the school hid the antisemitic incidents from the community for several months, and, according to Amicus NTA, threatened teachers with retaliation for advocating more transparency regarding the antisemitic incidents. *See Read the full letter from Newton teachers union*, The Boston Globe (Mar. 19, 2016), https://www.bostonglobe.com/metro/2016/05/23/read-full-letter-from-newton-teachers-union/gBHVrZOIccP953azMJRyDO/story.html.

In 2017, swastikas and antisemitic posts returned to Newton North. See John Hilliard, *Swastikas, 'offensive posts' reported at Newton North*, THE BOSTON GLOBE (Feb. 8, 2017), https://www.bostonglobe.com/metro/regionals/west/2017/02/08/swastikas-offensive-posts-reported-newton-north/Jr25lqsEHqTiwLwsatCN0I/story.html. And this year, the swastikas, and "threatening language" returned to F.A. Day Middle, as well. See Breanne Kovatch, *Swastika, threatening language found drawn on desk at Newton middle school*, THE BOSTON GLOBE (May 21, 2019), https://www.bostonglobe.com/metro/2019/05/21/swastika-found-drawn-desk-newton-middle-school/XfTZOn3Nxo9nyFxK1cXDHJ/story.html.

On May 21, 2019, students from the Rambam Mesivta High School, a private Jewish religious school on Long Island, New York, hired a bus and rode five hours to Newton, Massachusetts to hold a rally and a press conference in front of Newton South High School. The Rambam students and their principal, Rabbi Zev Friedman, are not easily intimidated, protesting for years outside the Jackson Heights house of a Nazi SS concentration camp until he was deported to Germany in 2018. But Rabbi Friedman and his students were not prepared for the reception they received at Newton South from a crowd of Newton South students, accompanied by Defendant Stembridge, who heckled, ridiculed, cursed, and menaced the rabbi and his students. According to the rabbi, some Newton South students improvised signs that said "Go

back to New York." As Rabbi Friedman tried to give his statement to the gathered media, and as Jewish students read out the names of Jewish victims of antisemitism, Newton South students repeatedly screamed "we can't hear you!" to intimidate and drown out the voices of their teachers' critics. One Newton South student began to move menacingly toward the rabbi and the Rambam students while screaming and agitated until a police officer intervened to move him back. Defendant Stembridge, though present among the Newton South students, did nothing to intervene or to stop his students from bullying and intimidating the Jewish Rambam students.

As Rabbi Friedman said at a press conference:

"I didn't realize why there's so many students of the Jewish faith, and not of the Jewish faith, that felt intimidated when they came to school [at Newton South]. But now I realize it. It's very clear that there is a culture of intimidation and a lack of open-mindedness taking place in this school."

*Newton South Students Heckling Orthodox Jews*, https://youtu.be/OCunXKvoomI

This culture of intimidation was on full display at the Curriculum Petition hearing, *see* Second Amended Complaint, ¶¶ 211-229, where both teachers and students—current and former—denounced the Newton residents who had signed the petition asking Defendants to review their curriculum. "[H]ere we are, indulging an attempt to punish our teachers for taking a risk to provide a quality education to their students," complained one former student. Another former student attacked critics of the Newton curriculum as "Alt-Right affiliates with political agendas attempting to hijack and warp our curriculum," ostracizing critics like Plaintiff Doe by claiming that "[i]n Newton we are too wise, too nuanced in our evaluation of facts, for these sinister attempts to land." The former student continued to castigate criticism of the Newton curriculum as "flagrant lies" and "evil harassment," and made it clear that she was calling for the social ostracism of the curriculum's critics: "It's time for our community to make clear that not

all . . . viewpoints are legitimate. This viewpoint is not. . . . Embracing nativism and nationalism as legitimate philosophies to be protected by schools would mean welcoming hate into our classrooms." The former student then ridiculed curriculum critics' concerns about physical safety as "whin[ing] and bully[ing] and pretend[ing] to be victims, all to bring fringe views into the mainstream discussion." *Petition Hearing*, https://newtv.org/education-blog/110-the-sports-guys/5422-newton-school-committee-curriculum-public-hearing-november-27-2018.

Defendant Bedar then asked "all those present who support the curriculum and values of the Newton public schools to stand at this time," and walk out, leaving the curriculum's critics alone in the hearing auditorium. *See* Second Amended Complaint ¶¶ 218-19. This performative act of social ostracism of the curriculum's critics was well-planned and dramatic theater, involving about 100 students and teachers.

Plaintiff Doe has seen videos of the ostracizing theatrics at the Curriculum Petition hearing, and of the Rambam Mesitva Jewish students being menaced in front of Newton South. This disdain for minority viewpoints makes Plaintiff Doe feel helpless and alone. He/she knows that Defendants are quite popular among the NPS student body and that Defendants' critics are very much not. Whatever the outcome of this suit, unless he/she is allowed to proceed pseudonymously, Plaintiff Doe's child(ren) will pass through adolescence marked by peers as involved in "evil" and "sinister attempts" by "Alt-Right affiliates" with illegitimate viewpoints "to hijack and warp our curriculum." Plaintiff Doe is well-aware, from news reports, of "Burn the Jews," swastikas, and other threatening antisemitic graffiti that appear to be endemic at Newton Public Schools. Plaintiff Doe fears that his child(ren) will become a target for these frequent antisemitic threats of physical harm if his/her identity is revealed. Ultimately, Plaintiff Doe fears that like the plaintiff in *Deveney1 v. Board of Education*, 231 F. Supp. 2d 483 (S.D.W.

VA. 2002), his/her child(ren) will endure beatings or, like the plaintiffs in *Dobrich v. Walls*, 380 F. Supp. 2d 366 (D. Del. 2005), his/her family will be forced by harassment, anti-Semitic taunts, and veiled threats from fellow community members to move out of Newton. This would deprive Plaintiff Doe's child(ren) of the benefits of a public school education in Newton, thereby effecting the very injury he/she is litigating against.

### III. Plainiff Doe's Minor Children Have a Heightened Privacy Interest

Establishment Clause cases involving children raise particular privacy concerns because minors are especially susceptible to social pressure to conform (*see Lee v. Weisman*, 505 U.S. 577, 593-94 (1992)) and are consequently less likely to openly challenge a popular governmental practice, no matter how deeply it offends them, for fear of standing out. Moreover, depending on age and temperament, children may lack the emotional maturity to cope with fierce community opposition and social ostracism, or the physical ability to protect themselves against bullying and retaliatory violence. If Plaintiff Doe is not allowed to proceed anonymously, he/she will be "required to disclose information of the utmost intimacy" about his/her minor child(ren), *Doe v. Bell Atl.,* 162 F.R.D. at 420, and risk the child(ren)'s physical and mental health. See *Doe v. Aetna Life Ins. Co.*, 2016 U.S. Dist. LEXIS 194383, at *10. Permitting Plaintiff Doe to litigate anonymously is necessary to protect his/her child(ren)'s privacy.

### IV. Plainiff Doe is Challenging a Popular Government Action

The District of Massachusetts has noted that "Courts are more likely to permit plaintiffs to proceed under a pseudonym when they are pursuing a claim against the government rather than a private individual." *Doe v. Smith*, No. 18-12266-PBS, 2018 U.S. Dist. LEXIS 188585, at *3 (D. Mass. Nov. 5, 2018) (quoting *Int'l Refugee Assistance Project v. Trump*, 2017 U.S. Dist. LEXIS 29058, 2017 WL 818255, at *3 (D. Md. 2017)). *See also Doe v. Bell Atl. Business Sys.*

*Servs.*, 162 F.R.D. 418, 420 (D. Mass. 1995). Courts in other circuits have noted that "the plaintiff's interest in proceeding anonymously is considered particularly strong" in cases challenging a statute or governmental policy because "[i]n such circumstances the plaintiff presumably represents a minority interest (and may be subject to stigmatization), and there is arguably a public interest in a vindication of his rights." *EW v. N.Y. Blood Ctr.*, 213 F.R.D. 108, 111 (E.D.N.Y. 2003). *See also Doe v. Porter*, 370 F.3d 558, 560 (alluding to this principle in Establishment Clause case); *Doe v. Stegall*, 653 F.2d 180, 185-86 (applying this principle in Establishment Clause case). Here, as explained above, Plaintiff Doe has challenged a popular governmental action. He/she fears that disclosure of his/her identity would result in governmental retaliation, social ostracism, and even physical or mental harm. Disclosure would therefore likely chill Plaintiff Doe's exercise of his constitutional rights and deter other individuals from challenging popular, though unconstitutional, practices.

## V.  Plainiff Doe Has Guarded His/Her Anonymity

Plaintiff Doe has carefully guarded his/her anonymity. His/her identity is known only to Plaintiffs' counsel; and will be known to the Court once the Court allows Plaintiffs' motion to file Plaintiff Doe's affidavit under seal. Even the other Plaintiffs, and especially Defendants, do not know who he/she is. While the District of Massachusetts has "held that previous disclosure of a party's identity made the motion to proceed anonymously ineffective," this is clearly not the case here. *Doe v. Word of Life Fellowship, Inc.*, No. 11-40077-TSH, 2011 U.S. Dist. LEXIS 78383, at *7 (D. Mass. July 18, 2011) (citing Doe v. Bell Atl., 162 F.R.D. at 422.).

## VI. Protective Order

In order to ensure that Plaintiff Doe's identity is fully protected, Plaintiffs request the entry of a protective order prohibiting any person from disclosing Plaintiff Doe's identity, and providing that any documents containing Plaintiff Doe's and/or his/her identities be filed with the Court under seal.

## CONCLUSION

Plaintiff Doe's several particularized needs for confidentiality, as detailed above, outweigh any generalized public interest in disclosure of his/her identity in a lawsuit challenging a curriculum that is universal and mandatory for all NPS students, Plaintiff Doe's child(ren) included. For all of the above reasons, Plaintiff Doe requests that the Court grant his/her motion to proceed pseudonymously, allow him/her to file his/her affidavit under seal,  and issue a protective order protecting his/her identity.

PLAINTIFFS
By their attorney,

Karen Hurvitz
BBO No. 245720
Law Office of Karen D. Hurvitz
34 Tanglewood Drive
Concord, MA 01742
(617) 513-3365
HurvitzLaw@comcast.net

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered parties as identified on the Notice of Electronic Filing (NEF) on July 19, 2019.